**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

CONSTANCE COURTNEY,

       Plaintiff,

                                CASE NO.

v.

THE RESIDENCES AT SANDPEARL         **JURY TRIAL DEMANDED**
RESORT OWNER'S ASSOCIATION,
INC. and ROBERT M. SIMPSON,

       Defendants
_____/

## **COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Constance Courtney ("Courtney" or "Plaintiff"), by and through her undersigned attorneys, hereby files this Complaint and Demand for Jury Trial, and sues The Residences at SandPearl Resort Owner's Association, Inc. ("SandPearl" or "Association") and Robert Simpson ("Simpson")  (collectively, "Defendants"), and in support thereof, alleges as follows:

1.     This is an action for injunctive relief, monetary damages, punitive damages and declaratory relief brought by Plaintiff who, during all times mentioned herein, was a tenant at a condominium rental unit owned by Joint Venture Sandpearl Unit 403 ("Landlord") at 11 Baymont Street, Unit # 403, Clearwater Beach, Florida 33767 (the "Premises").  Defendant Sandpearl was at all times mentioned herein the Homeowner's Association within which the Premises exists. During all times mentioned herein, Defendant Simpson was on the Sandpearl Board of Directors, and is presently President of the Board.

2.  Plaintiff alleges claims based upon Defendant's violations of the Fair Housing Act, Title VIII of the Civil Rights Act of 1968 (the "FHA"), as amended, 42 U.S.C. §§ 3601 *et seq.* (hereinafter, the "Act").

**JURISDICTION AND VENUE**

3.   Jurisdiction of this Court is invoked pursuant to the FHA, 42 U.S.C. § 3613 and 28 U.S.C. §§ 1331 and 1343.

4.   Venue is in the District of the Middle District of Florida, Tampa Division, where Defendants are located, own or manage property, have their principal place of business and have sufficient contacts pursuant to 28 U.S.C. § 1391(b) and (c).

**PARTIES**

4.   Plaintiff is an individual residing at the Premises pursuant to the above-referenced Lease.  During all times mentioned herein, she suffers from a disability which substantially limits one or more of her major life activities.  In particular, she suffers from asthma and reactive airways, which significantly impairs her ability to breathe.  Plaintiff is highly allergic to tobacco smoke, exposure to which escalates to asthma attacks and possible respiratory arrest, which, if not treated, could be fatal.  Because of her disability, Plaintiff must carry an Epi Pen and Albuterol Inhaler, both of which Plaintiff has had to use at SandPearl due to exposure to tobacco smoke.

5.   During all times mentioned herein, Defendant SandPearl was and is a not for profit corporation organized and existing under and by virtue of the laws of the State of Florida, with an office and principal place of business located at 11 Baymont Street, Clearwater, Florida 33767, and is a homeowner's association with the right, duty and obligation to enforce the deed restrictions that encumber Plaintiff's Premises and all other units within the Premises property.

6.   During all times mentioned herein, Defendant Simpson was and is an individual who resides within the condominium property, with an address at 11 Baymont Street, Unit 708, Clearwater Beach, Florida 33767 and is presently President of Defendant SandPearl Board of Directors ("Board").

**Supporting Facts**

7.   During all times mentioned in this Complaint, Plaintiff was an "aggrieved person" within the meaning of the FHA, in that she sustained actual injury by virtue of and as a proximate result of the unlawful conduct and discriminatory actions of Defendants.   Those damages include, but are not limited to, denial of Plaintiff's right to full enjoyment of the lease of her Unit, which includes a patio overlooking the Gulf of Mexico, use of the Premises garage, and the pain and suffering suffered by Plaintiff as a result of her repeated and ongoing exposure to tobacco smoke despite her many complaints of same, and humiliation, embarrassment and emotional pain inflicted by virtue of Defendants' callous and indifferent violations of her statutorily protected rights.   Plaintiff is entitled to an award of punitive damages against Defendants since, as more fully set forth below, their conduct reflects a reckless and callous indifference to Plaintiff's federally protected rights, and, indeed, shows a blatant intention to punish Plaintiff by intentionally exposing her to toxic smoke they full well know could be fatal to Plaintiff.

8.   Plaintiff, who has rented at SandPearl for years, commenced her tenancy at Unit 403 in 2015.   The Unit includes an outdoor balcony, which Plaintiff used for container gardening, dining, reading, working, spending time with friends and with her dogs and her son.   Defendants were well aware of Plaintiff's disability, including the fact of how dangerous tobacco products were to her.   As more fully set forth below, beginning in 2017, Plaintiff became exposed to tobacco products at SandPearl through resident and Defendant employee smoking under her Unit and in Defendant SandPearl's residential garage.   These exposures led to multiple asthma attacks, respiratory arrests, and ongoing fear that Defendants' unreasonable refusal to respond to Plaintiff's multiple complaints of tobacco exposure could lead to serious medical consequences for Plaintiff,

even death.   Instead of addressing Plaintiff's complaints and requests for a reasonable accommodations to alleviate the smoking conditions, Defendants ignored Plaintiff's complaints, disparaged and ridiculed her to employees, residents, and Clearwater business beach owners, embarked on a campaign of harassment and intimidation, and retaliated against Plaintiff for her exercise of her statutorily protected rights, by, among other things, being actively engaged or complicit in SandPearl management encouraging others to smoke directly under her Unit and next to her car in the garage.   Defendant Simpson approached people at the  pool and asked them to smoke under Plaintiff's Unit even though he knew the results could be fatal, laughing about it.

9.   In or around March, 2017, the Florida Board of Health cited Defendant for violations of the Florida Clean Air Act because of smoking in the residential garage.   The Board of Health conducted an investigation which Plaintiff assisted.   In retaliation for her involvement with the garage smoking issue, SandPearl placed ash trays next to her car, which was also keyed, had a brown liquid thrown on it, and two tires that had air bled from them.

10. In further retaliation against Plaintiff for her assistance to the Department of Health in connection with their citation against SandPearl for the garage smoking, Defendants both tacitly and overtly encouraged smoking under her Unit on the pool deck, including placing ash trays in this area.   There had not been a smoking area there prior to her involvement with the Florida Department of Health.   And that encouragement continues notwithstanding Defendants' awareness of the danger to Plaintiff.

11. On April 16, 2017, Plaintiff spoke with then Defendant Simpson  about smoking under her Unit, that the smoke was getting into her Unit and was making her ill.   Plaintiff complained that she understood this area had been designated as a "smoking area" which he should have known

exacerbated her asthma attacks. During the conversation, Defendant Simpson noticed Plaintiff's EpiPen, asking her what it was. He was told it was her EpiPen, and what it was used for.

12. On July 6, 2017, during a scheduled social room meeting on the third floor with then Board President Dr. Selvige, Plaintiff complained about smoking in what was understood to be a newly established smoking area under Unit and its impact on her medical condition. Plaintiff offered to show Dr. Selvige medical support for her claims, but he refused, getting upset and storming off telling her neither he nor the Board would either look at the documents or do anything with them. He also told Plaintiff that she had probably been mis-diagnosed, and probably had COPD.

13. The next day, July 7, 2017, Plaintiff discovered a brown fluid had been thrown on her car, and her car had been keyed, both of which were done in manifest retaliation for the complaints and accommodation requests she made to Dr. Selvige. This was documented, photographed, and reported to the Clearwater police. Retaliatory damage to Plaintiff's car was repeated on January 31, 2018 when Plaintiff found air had been let out of two tires on the driver's side.

14. On July 20, 2017, Plaintiff engaged in email communication with Board attorney Robert Tankel concerning what Plaintiff described as damage to her car she believed was in retaliation for her complaints about smoking, including that she would hold Defendant SandPearl responsible for same. Plaintiff specifically complained about smoking under her Unit, that the smoking had prompted an asthma attack, that other neighbors had also complained about the smoking as well, and that "next time I may not get to the Epi Pen and rescue inhaler."

15. On July 19, 2017, in apparent response to Defendant SandPearl's efforts to satisfy the Florida Department of Health that their garage was now in compliance with the Florida Clean Air Act, the Florida Department of Health notified the Board that, based upon Defendant SandPearl

reporting, it appeared that SandPearl was in compliance with the Act, and that the Department of Health was closing its file in the matter.

16. On August 1, 2017, in manifest retaliation against Plaintiff for her smoking complaints, the SandPearl Board sent a "Dear Neighbor" letter to SandPearl residents stating, *inter alia*:

- The Board had received a request from "an occupant who asked for a 'reasonable accommodation' under the Fair Housing Act as it applies to regulation of smoking on the pool deck which results in <u>second hand smoke</u> that carries into a unit from the pool deck, when the balcony door is open." (emphasis in the original)

- That the Board wanted all unit owners to understand that while the Board was "well aware' of its obligations under the law it felt the "need to keep the word '**<u>reasonable</u>**' in mind". Admitting that "second hand smoke is no doubt dangerous", and noting that Defendant SandPearl "was forced to ban smoking in the garage after a complaint by an owner to the state" (claiming the Association was now in compliance per the state's letter), Defendant SandPearl argued that it was not obligated to ban smoking; "rather to make a '**<u>reasonable'</u>** accommodation." (emphasis in the original). In fact, Plaintiff had not demanded a total smoking ban; just not under her Unit or in the garage.

- The letter went on to argue that the question was "what is reasonable under the circumstances", a question it claimed was rendered "more difficult because the unit is near the pool deck, in the area of shade, with seating where people already like to congregate and occasionally smoke."

- The letter went on to complain that the Board was "troubled by what amount of smoke is "**<u>acceptable</u>**", and that the question is then "how to measure the smoke so as to be able to regulate it. If the answer is "**<u>none</u>**" then we have a deeper problem as we are not sure that is a reasonable accommodation." (emphasis in the original)

- The letter concluded that the Board did not "know how many people smoke in this particular area so we are looking to install an additional camera to record the area and have it reviewed to see how many people actually smoke there, how often and so forth", but that "it could be that the second hand smoke is coming from an adjacent unit or units where the condominium association has no authority to deal with this area…" The Board promised to review the issue at the next Board meeting.

17. The above letter is important for a number of reasons. First, it unequivocally acknowledged receipt of Plaintiff's requests for a reasonable accommodation, and the reasons for same, openly admitting that "second hand smoke is no doubt dangerous." Of course, it is a matter

of life and death to someone with Plaintiff's condition, a condition Defendants were manifestly aware of.   Second, the letter displays the palpable disdain with which Defendants viewed Plaintiff's requests to stop the smoking under her Unit by complaining how it was "forced" to stop smoking in the garage smoking which is illegal under the Clean Air Act.   Third, the letter shows that the area under Plaintiff's Unit was used for smoking (people already like to congregate and occasionally smoke), a fact Defendants quibbled over with Plaintiff later on.   Fourth, the letter displays Defendants' distain for having to make a decision that would require them to determine "what amount of smoke is acceptable", which, in fact, was not what plaintiff was asking at all. Fifth, the fact and tone of the letter were conveyed to the rest of the Association residents, who were presented with a polemic against Plaintiff who was only trying to protect her health and well-being. This letter was a harbinger for the outright contempt with which Defendants treated Plaintiff and her requests thereafter.

18. The August 24, 2017 Notice of Board Meeting and Agenda, number "7" state "Smoking on Pool Deck Update."  This appears to be the extent of any "formal" Board action on Plaintiff's myriad requests for a reasonable accommodation in this location.

19. Plaintiff has been informed and believes that Defendant Simpson was directly involved with and a driver of encouraging smoking at SandPearl, including under Plaintiff's Unit as well as in the garage.   Defendant Simpson and other Board Presidents refused to act on Plaintiff's complaints that smoking was a life-threatening issue for her, instead encouraging and pandering to others to smoke directly under Plaintiff's Unit, a sheltered area protected from wind which the smokers apparently enjoy.   Defendant Simpson and other Board member's both directly and through  SandPearl property management, actually told new residents/tenants to smoke under her Unit during orientations, and to advise others to smoke there as well.   The property manager

admitted to Plaintiff that Defendants had told her in February, 2017 to set up smoking and cigar bar under her patio and to instruct all residents and guests to smoke there.

20. In late 2017, the owners of Plaintiff's Unit wrote to the Board asking that the smoking area under Plaintiff's Unit be moved.  It was not, and the smoking continued to occur.  This demand was renewed by the Owners on the Unit in late November, 2019, noting the prior complaint.  This demand was similarly ignored, and the smoking continued.

21. In January, 2020, manifestly upset by receipt of Plaintiff's HUD complaint, Defendant Simpson made disparaging remarks about Plaintiff to others, that Plaintiff was going to be forced to move out, that Defendant Simpson would take action to see that Plaintiff's lease was not renewed, and that he would sue Plaintiff for "harassment".

22. On September 12, 2017, Plaintiff engaged in email communications with the Defendant SandPearl Board concerning ongoing smoking in the residential garage despite the Florida Department of Health March, 2017 citation, advising the Board that SandPearl employees had been smoking in front of her in the garage knowing that she has asthma; that there were four smoking buckets in the garage full of cigarette butts; that Plaintiff had reported the incident to the concierge that evening; and that Plaintiff had already used her inhaler once that evening and twice the day before because of garage smoke.  Plaintiff asked since it was not legal to smoke in the garage under the Florida Clean Air Act, why wasn't the law being followed, and that "you now I have asthma and this is a life or death situation for me."

23. The Board's response was that the incident happened during a time of a hurricane and everyone was on edge and stressed, and that "if something like this was going to bother you, perhaps you shouldn't have stayed during the mandatory evacuation."  Plaintiff responded to this callous disregard for her health and well-being by saying "this is life or death for me"; it was not

just the two days she was complaining about; that she has complained numerous times about the failure to comply with the law in the garage; and that she had to use the garage every day. Responding to the Association's hurricane excuse. On September 13, 2017, the Florida Department of Health, rejecting the Board's hurricane excuse, noted to the Board that the initial complaint about the garage was registered in March, 2017, six months before, not so subtly suggesting that the Board needed to take action.  Once again, however, as with Plaintiff, Defendants ignored the illegal garage smoking, which continued.

24. A subsequent complaint to the Florida Department of Health about the continuing garage smoking problem brought a suggestion from them to Defendants to remove all smoking buckets from the garage, reiterate the no-smoking policy for employees and residents, and post no smoking signs in the garage.

25. Notwithstanding Plaintiff's efforts to get Defendant SandPearl to comply with the law and its own policies, policies that SandPearl knew were critical to Plaintiff's health, Defendants ignored the law, their own policies, and the direction of the Florida Department of Health, and permitted smoking to continue in the garage area.  On September 14, 2017, Plaintiff emailed Defendant SandPearl's attorney, the Florida Department of Health and the Board President that smoking was continuing in the garage.  This email apparently prompted the Florida Department of Health to again weigh in on September 15, 2017 with the renewed suggestion that smoking containers be removed from the garage since their existence suggests it is OK to smoke there, and noting that second-hand smoke has many effects which contribute to disabilities for some people, that disability laws are designed to insure that people with disabilities have an equal opportunity to reasonable accommodations (which included a description of what a disability is), that many courts have recognized that individuals are disabled when they have severe asthma, and to "always

remember there is no constitutional right to smoke." The Board response was an email from their attorney insisting that SandPearl employees are not permitted to smoke in the garage, that there are "designated areas at the resort", and that anyone observing an employee smoking should report it to the SandPearl. The Board went on to argue that Defendant Sand Pearl did not place the ashtrays in the garage because there should be no smoking there, a "policy" observed mostly in the breach as evidenced by the continued evidence of smoking notwithstanding the claimed policy.

26. On November 1, 2017, a SandPearl representative emailed another resident who had complained about smoking that "there is no smoking anywhere on the property including the pool areas, boardwalk, garage, etc." As noted further below, this "policy" is inconsistent with other SandPearl communications and, in any event, was not followed.

27. On November 6, 2017, frustrated by Defendants' continued refusal to follow state law and its own purported "policies", Plaintiff emailed "all SandPearl Unit Owners", forwarding prior emails, and noting that she had been complaining about smoking since at least 2015, that she had had respiratory arrests as a result, and that the SandPearl property manager was ignoring her complaints.

28. In a separate November 6, 2017 letter to the SandPearl Board of Directors, Plaintiff, in frustration at Defendant's failure to take her complaints seriously, wrote a formal letter to Defendants reiterating the fact of her of her asthma disability, and renewing her requests for a reasonable accommodation for her asthma which, Plaintiff noted, escalates to respiratory arrest by exposure to tobacco/cigar smoke. In her letter, Plaintiff:

- States she has suffered respiratory arrest three times in the past two years.

- That tobacco smoke had been entering her Unit for almost two years and overwhelmed her patio. She described the smoke as coming from under her Unit by the main pool exterior door and social room. Plaintiff stated that smoke entered her Unit each time she opened her door day and night an each day of the week.

- That the continuous exposure to tobacco smoke aggravated her disability by causing respiratory arrests and asthma attacks.

- Plaintiff forcefully explained the hazards of second-hand smoke, asking that the Board ban smoking under her Unit and enforce it.  She also asked that the Board post no-smoking signs and that ash trays be removed.

- Plaintiff advised the Board that the State Board of Health inspector had actually inspected the area under her Unit and told the SandPearl manager that there should not be smoking in this area because of its configuration.

- Plaintiff advised the Board that she had been retaliated against for complaining about smoking and her health when someone vandalized her car one day after she discussed the smoking issue on her health with the then Board President.

- Plaintiff stated she had been complaining about smoking under her Unit for two years to no effect, and that others had complained as well with the same result.

29. On November 19, 2017, another resident, who also owned retail space and a portion of the garage, emailed a complaint to the Board about the continued garage smoking, including that the SandPearl's manager and her assistant were heavy smokers who the resident had seen smoking daily in the garage for years.  Plaintiff emailed the Board on the same day, complaining that she saw a SandPearl employee smoking on the garage 1st floor southwest corner , which she reported to the concierge.  She further stated "as you know, I had a severe asthma attack last week because of the exposure to smoke again in the garage.  Signs are posted.  Buckets remain in the garage.  Smoking continues."

30. On November 23, 2017, a SandPearl representative emailed Plaintiff that the SandPearl policy is that employees are not permitted to smoke in the garage; that SandPearl had "a designated area for smoking at the resort", and that if anyone saw an employee smoking to let the Board know.  This statement of SandPearl "policy" ignored the reality of what was actually happening, but, curiously, confirmed Plaintiff's claim of another "smoking area" under her patio.

31. On December 13, 2017, Plaintiff sent another email to the Board

32. In a December 18, 2017 email responding to ongoing garage smoking complaints, the then Board President argued that all ash cans owned by the SandPearl had been removed from the garage the evening of November 2, 2017, and taken off site; that the Board had "no responsibility for any appearing after that date".  Instead of addressing the issue of SandPearl's management "assistant" smoking in the garage, and in manifest retaliation for asserting her statutory rights, the Board demanded "names of all witnesses, dates of occurrence, and photos, if available", further threatening that any persons making accusations later disproved will be held responsible for creating a hostile working environment.

33. Further evidence of Defendant SandPearl's retaliation against Plaintiff was a December 21, 2017 email communication with the then Board President informing him that Plaintiff had received complaints from other owners about Plaintiff "harassing employees" because of complaints about smoking.

34. On January 2, 2018. Plaintiff emailed then Board President Selvidge complaining about smoking in the garage and stairwells, noting this was illegal, and sending him a copy of a statute Plaintiff claimed confirmed it.  Plaintiff noted that she had been reporting this condition to the concierge on a daily basis, including photos of smoking buckets in the garage.  When the Board President promised to raise this during the next Board meeting, Plaintiff argued that the issue needed to be dealt with immediately, should have been dealt with months ago, and that she had reported smoking in the garage as recently as two weeks prior.  Plaintiff urged the Board President that this conduct was illegal and against policy, that she had suffered from asthma attacks as a result, and pleading with the Board to tell her what she had to do for them to enforce their own policy.

35. On February 25, 2018, another resident memorialized the ongoing smoking issues at

the Premises in an email to an attorney which included the following:

- That she had raised smoking at the pool area under the balconies at the November 2, 2017 Board Meeting, including the issue of smoke drifting up to Plaintiff's balcony as well as another tenant who was so upset they informed the owner that they would never rent there again.

- That another tenant had told her that during orientation at the Premises the then Building manager told her that cigar smoking was permitted in the area just under Plaintiff's Unit, and that the tenant had seen people smoking in that area.

- That in response to the tenant's complaint, the property manager said "there is no smoking in that area" when she herself had done so on multiple occasions.

- That while the Board stated it had agreed to take action on the garage smoking issues, it had failed to do so until the buckets were removed on November 22, 2017.

36. On February 26, 2018, the same resident emailed the SandPearl's then property manager that her assistant was observed smoking in the P1 parking garage level.

37. On November 10, 2019, Plaintiff again emailed Defendant SandPearl complaining about smoking under her Unit, that her condo unit was filled with tobacco smoke from underneath her Unit, and that she could not use her patio and could not open her patio door.  Plaintiff pleaded with management to prevail upon the SandPearl to stop the smoking, ending with the plea "I am going to die here."

38. The SandPearl's management response was telling. While apologizing for the "inconvenience", the respondent acknowledged sitting in the area under Plaintiff's Unit with others who were admittedly smoking, arguing that "if the smoking was bothering you on the fourth floor and you saw me sitting there, you should have contacted me immediately and I will (sic) have them move to other smoking area away from your balcony."  In other words, Defendants opted to blame the victim instead of addressing her reasonable request.  The writer went on to fatuously claim Plaintiff "dropped water on us" in violation of the condo documents and regulations.  The writer concluded that "smoking is not allowed anywhere inside the building * * * but people

however may smoke outside the building or in the open areas on the pool deck away from the doors," even though he was not "away from the doors', but under Plaintiff's bedroom window next to the patio.

39. The next day, Plaintiff emailed SandPearl management that she had heard from the Florida Department of Health that they had advised SandPearl that under Plaintiff's Unit was the absolute worst place on the property to smoke, and would be pleased to meet with SandPearl representatives to discuss it.  Plaintiff reiterated prior complaints about excessive cigar and cigarette smoke under her Unit so bad that Plaintiff as well as other tenants had to leave the patio and go inside.  Plaintiff reiterated that she had been asking repeatedly to have the area under her Unit designated as no smoking, and that such a designation was critical to her health.  Again, Defendants did not respond.

40. Instead of responding to Plaintiff's reasonable request to accommodate her disability, Defendant SandPearl retaliated once again by issuing a "warning" to Plaintiff for pouring water on residents under her Unit.  Unapproved December 12, 2019 SandPearl meeting minutes reflect the outrageous nature of SandPearl's response:

> New Business.  Letter from a Tenant:  Mr. Ibrahim announced that the association received a letter from a resident regarding smoking in the pool area and request for no smoking in this area.  Mr. Ibrahim announced that the city did visit the property and we are not legally bound to prohibit smoking in this area.  Mr. Ibrahim announced that the resident poured water on him and other residents sitting in this area.  The board agreed to send her a warning letter for pouring water on anything on residences (sic) in the sitting area at the pool deck.

41. In other words, in the face of years of complaints and requests to move smoking away from under Plaintiff's Unit, the Board's response was to falsely claim Plaintiff violated Sandpearl rules and threaten her with a "warning letter" while continuing to ignore her request, this time

claiming that there was no "legal inhibition" to smoking in this location, and threatening to call "the authorities" and fine Plaintiff.

42. Plaintiff responded to the water pouring claim stating that she did not drop water on anyone, and reiterating her claim that her multiple requests for a reasonable accommodation had been ignored for years in violation of the FHA.

43. On December 22, 2019, upon return to her Unit from a trip, Plaintiff found an ash tray had been moved next to her car in the garage. This was reported to Defendants' concierge. Plaintiff was told by a SandPearl employee that the President of the Board, who Plaintiff believed to be Defendant Simpson at that time, placed the ash tray there. The ash tray remained there until the Florida Health Inspector found it on March 5, 2020.

44. While the Florida Department of Health did not formally cite SandPearl for permitting (if not encouraging) smoking under Plaintiff's Unit (since it is outdoors, there is no violation of the Florida Clean Air Act), the Department of Health did admonish SandPearl several times in 2017 and 2018 to move the smokers away from under Plaintiff's patio and the main doors of the pool deck. In late 2019, a Florida Department of Health representative met with Defendant Simpson and a member of the management company expressing her view that it was illegal to continue to permit smoking under Plaintiff's Unit when they had been informed and knew that Plaintiff had a disability aggravated by tobacco smoke. Defendants' response, consistent with prior arrogant refusal to even consider Plaintiff's reasonable accommodation requests, was to ask the Department of Health representative whether it was technically illegal to smoke there. When the Department of Health representative said it was not a technical violation of the Clean Air Act because it was outdoors, Defendants lost interest in the discussion, even after the Department of Health representative showed them where to move the smoking area.

45. Frustrated by Defendants refusal to grant her requests for reasonable accommodation and their retaliation against her for making the requests, Plaintiff filed a HUD complaint against SandPearl on January 2, 2020.  The smoking issues have not abated, but continued in both the garage and under Plaintiff's Unit.  Retaliation against Plaintiff has also continued in the form of ongoing threats that Plaintiff's lease will not be renewed, that the Board intends to sue Plaintiff for filing her HUD complaint, and that the Board intends to sue Plaintiff's landlord for renewing her lease over Defendants' objections.  Defendants have described Plaintiff's complaints as a joke and going nowhere.

46.  In further retaliation for Plaintiff's requests for reasonable accommodation, and the filing of her HUD complaint, Defendants have refused to permit her son access to the Unit, arguing that he is not on the lease despite the fact that he clearly is.  This has caused Plaintiff great stress and emotional upset since she wanted her son, a student, to be with her in this time of pandemic.  And, Defendant Simpson was permitted to have friends of his daughter visit him without apparent restriction.  Plaintiff was told her son could not stay at her Unit despite being on the lease, and was barred from the Premises on Easter, adding additional unnecessary stress to Plaintiff.

47. Since her HUD filing, Defendants have refused Plaintiff's multiple requests to pressure wash her balcony area, which is coated in nicotine and tar as a result of the smoking under her Unit.  And they have done so even though the pool deck and other owner's balconies were pressure washed during this period.   Because of the condition of her balcony, Plaintiff cannot use it.  Initially told this would not be a problem, permission was denied even after Plaintiff promised to pay for the work, all in further retaliation against Plaintiff for her exercise of her statutory rights.

48. As recently as May, 2020, Defendant Simpson has continued to smear and defame

Plaintiff, describing her as a chronic complainer who should not be listened to.  Specifically, he falsely told another resident that Plaintiff was complaining about that resident's daughter violating Association rules concerning visits during the pandemic.  This had the desired affect of angering others who will now not speak with Plaintiff.  Defendants have refused Plaintiff access to the concierge log to prove that what they are claiming is false.

### COUNT I
(Failure to Reasonably Accommodate)

49. Plaintiff repeats and reiterates the allegations in paragraphs "1" through "48".

50. This is a claim by Plaintiff against Defendants for their refusal to make a reasonable accommodation and move smoking out from under Unit and stop it in the Association garage,  when such accommodations are required by 42 U.S.C. § 3604(f)(3)(B).

51. Plaintiff suffers from a handicap within the meaning of 42 U.S.C. § 3602 in that she suffers from physical or mental impairments which substantially limit one or more major life activities.  In particular, she suffers from asthma and reactive airways, which significantly impairs her ability to breathe.  Plaintiff is highly allergic to tobacco smoke, exposure to which escalates to asthma attacks and possible respiratory arrest and death, if not timely and properly treated. Because of her disability, Plaintiff must carry an Epi Pen and Albuterol Inhaler, both of which Plaintiff has had to use at SandPearl due to exposure to tobacco smoke.

52. Plaintiff requested reasonable accommodations for cessation of smoking for the both garages area and the area under her Unit at the pool.  Specifically, Plaintiff asked that Defendant honor their own policy as well as Florida law and not smoke in the garage.  Plaintiff also sought a reasonable accommodation for a no-smoking policy under her Unit.  These requests were necessary to afford Plaintiff the opportunity to use and enjoy her Unit, including her garage, and to permit her to breathe without fear of a potentially fatal tobacco induced asthma attack.

17

53. Defendants refused to agree to the requested accommodations as set forth herein, as a direct and proximate result of which Plaintiff has sustained damages for which she should be compensated, including assessment of punitive damages against Defendants for its callous and reckless disregard of Plaintiff's disability and Plaintiff's protected rights.

WHEREFORE, Plaintiff respectfully requests that this Court:

(a)  declare the Defendants' actions complained about herein to be in violation of the Fair Housing Act of 1968, as amended, 42 U.S.C. § 3604(f)(3)(B);

(b)  order Defendants to take appropriate action to insure that the activities complained of are not engaged in again by Defendants, their agents, employees, and successors from discriminating against any person in violation of the Fair Housing Act of 1968, as amended;

(c)  order Defendants to take appropriate action to insure that the activities complained of are not engaged in again by Defendants, their agents, employees, and successors from discriminating against any person in violation of the Fair Housing Act of 1968, as amended;

(d)  award appropriate punitive and compensatory damages to Plaintiff and against Defendants;

(e)  award Plaintiff her attorney's fees and costs pursuant to 42 U.S.C. § 3613(c)(2); and

(f)  provide such other and further relief as this Court may deem just, proper and equitable.

## COUNT II
(Retaliation)

54. Plaintiff repeats and realleges the allegations in paragraphs numbered "1" through "48".

55. This is a claim by Plaintiff against Defendants for retaliation pursuant to 42 U.S.C. § 3617.

53. As more fully set forth above, Plaintiff engaged in protected activity, including asking Defendants to comply with its own policies and Florida law and granting Plaintiff's reasonable accommodation requests to stop smoking in the garage; asking Defendants for the reasonable accommodation of moving the smoking area away from the pool area below her unit; and filing the HUD complaint against Defendants on January 2, 2020 for their failures to accommodate and retaliation against Plaintiff regarding the garage and smoke entering her Unit from the pool issues.

54. Instead of reasonably accommodating Plaintiff's demands, and enforcing the law and its own rules on garage smoking and moving the smoking area away from the pool deck area under Plaintiff's Unit,  Defendants permitted garage smoking to continue even after being cited by the Florida Department of Health and swearing that the issues had been remedied; threatened Plaintiff with claims of employee harassment for reporting garage smoking, and then telling others that Plaintiff was harassing employees; encouraged, and even directed other residents and guests to smoke under Plaintiff's Unit; refused to move smoking away from under Plaintiff's Unit even though such a move would have cost Defendants nothing, and would also addressed other resident complaints about the smoking; attempted to force Plaintiff's landlord to non-renew her lease; threatened to sue Plaintiff and her landlord; shamed Plaintiff in front of other owners by suggesting that her reasonable accommodation requests to not smoke under her unit were, in fact, not reasonable, and at odds with what others wanted to do; ignored Plaintiff's reasonable accommodation requests in favor of inaccurate claims/warnings that Plaintiff dumped water on residents; refused to permit Plaintiff's son to stay at the Unit despite the fact that he is on the lease; refused to permit Plaintiff to pressure-wash her balcony area to remove the toxic tar and nicotine so Plaintiff could use it; and otherwise harassed Plaintiff for exercising her statutory rights and seeking to protect her health.  Defendant's actions, which continue, constitute "adverse actions"

in violation of the FHA, and a causal connection exists between the actions and Plaintiff's protected activities.

55. As a direct and proximate result of Defendants' actions, Plaintiff has sustained damages for which she should be compensated, including an  of punitive damages against Defendants for their callous and reckless disregard of Plaintiff's disability and Plaintiff's protected rights.

WHEREFORE, Plaintiff respectfully requests this Court:

(g)  declare Defendants' actions complained of herein to be in violation of the Fair Housing Act of 1968, as amended, 42 U.S.C. § 3617, *et seq*.;

(h)  order Defendants to take appropriate action to insure that the activities complained of are not engaged in again by Defendants, their agents, employees, and successors from discriminating against any person in violation of the Fair Housing Act of 1968, as amended;

(i)  award appropriate punitive and compensatory damages to Plaintiff and against Defendants;

(j)  award Plaintiff her attorney's fees and costs pursuant to 42 U.S.C. § 3613(c)(2); and

**(k)** provide such other and further relief as this Court may deem just, proper and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues pursuant to Rule 38(b) of the Federal Rules of

Civil Procedure.

Respectfully submitted,

SAADY & SAXE, P.A.

By: *Daniel L. Saxe*

Daniel L. Saxe, Esq.
Fla. Bar. No. 102962
Claire Saady
Fla. Bar No. 102954
First Central Tower
360 Central Ave., Ste. 1160
St. Petersburg, FL  33701
Tel: (727) 291-1900
Email: dan@saadyandsaxe.com
*Attorneys for Plaintiff*